IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 21, 2005

## STATE OF TENNESSEE v. HARVEY LILLARD WEBB

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2003-B-1445     Cheryl Blackburn, Judge**

_____

**No. M2004-02805-CCA-R3-CD - Filed September 27, 2005**

_____

The defendant, Harvey Lillard Webb, was indicted for premeditated first degree murder. He was convicted by a jury of the lesser-included offense of second degree murder. He was sentenced to twenty years in confinement as a violent offender. On appeal, the defendant challenges the sufficiency of the convicting evidence. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA MCGEE OGLE, JJ., joined.

Adrian Chick, Nashville, Tennessee, for the appellant, Harvey Lilliard Webb.

Paul G. Summers, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Rob McGuire and Brett Gunn, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**

The proof at trial reflects that the victim, Simon "Chief" Weaver, was killed on Lischey Street in Nashville on April 3, 2003. At trial, Steven Daniels testified that he hired the defendant to repair his vehicle's radiator. Daniels was not satisfied with the defendant's work; therefore, on April 1, 2003, he, along with Chief, confronted the defendant and demanded a refund. Daniels also told the defendant that he was expected to repair the problem. The defendant responded saying he was not responsible for the problem and acted like he was going to hit Daniels with a toolbox. So Daniels hit the defendant. Chief also "swung" at the defendant. Being outnumbered, the defendant walked inside a house.

Daniels testified that on the morning of April 3, 2003, he met with the defendant and apologized for his behavior. According to Daniels, the defendant then apologized to him for "messing up" his vehicle, but the defendant stated he was still mad at Chief. Later that afternoon, Daniels saw the defendant on Lichey Street. At the time, Daniels was in the company of Chief, Chris Bell and Derrick Booker, and the four of them went into Cantrell's Barbecue Pit. After leaving the restaurant and going into a nearby house, Daniels noticed that the defendant was still outside. Chief stayed outside the house to talk to Andrew Gantt.

Daniels testified that after about ten minutes, he came back out of the house and saw Chief walking around a trash dumpster. He then saw Chief try to run from the defendant, who was pointing a gun at Chief. As Daniels explained, the defendant shot Chief one time.

On cross-examination, Daniels admitted that he initially lied to police and told them that he did not witness the shooting because he was frustrated and trying to get out of there. Daniels also acknowledged that he had recently entered into a plea agreement where numerous charges against him were dismissed. However, Daniels adamantly denied changing his story in order to get a deal, insisting that he "was going to get [the deal] anyway." On re-direct examination, Daniels explained that he told the police everything about the shooting except the fact that he actually saw the defendant shoot Chief.

Andrew Gantt testified that he and Chief were outside when a man in a hooded sweatshirt walked by and shot Chief. Gantt stated that just one shot was fired. Gantt also stated that he and Chief did not have guns on them. Although Gantt did not get a good look at the shooter because of the hood, he described the shooter as black with facial hair. Latorie Carter testified that she saw Chief get shot and the shooter run up the sidewalk. However, Carter stated that she was unable to identify the shooter because it was dark.

Derrick Booker testified that he was present during the scuffle Chief and Daniels had with the defendant. Booker stated that he heard the defendant say he was going to get Chief. Booker also stated that he was with Chief and Chris Bell the day Chief was shot. According to Booker, the three of them went to eat at Cantrell's. Afterwards, he and Bell went inside the house to eat, but Chief stayed outside because he had already eaten. After hearing a gunshot, Booker went outside and met Daniels, who told him that the defendant had shot Chief. Booker stated that Daniels "was hysterical. He was crying and everything." Booker stated that he saw the defendant walking away. On cross-examination, Daniels acknowledged that he did not see the actual shooting take place, but insisted that he saw the defendant walking "up the sidewalk from 546 Lischey."

Yolanda Mason testified that around 3:00 p.m. on April, 3, 2003, she had a discussion with the defendant about working on her car. When she asked the defendant why he had not fixed her car, he told her that he was working on Daniels' car and that he had "gotten into it" with Daniels and Chief. According to Mason, the defendant told her that "Chief was trying to sleek him, but . . . he was going to get them." Mason then explained that her reference to "them" meant Chief. The defendant "was going to get Chief."

Officer Christopher Hendry testified that on April 3, 2003, around 6:45 p.m., he responded to a shooting call and proceeded to the crime scene. Upon reaching the scene located near 546 Lischey Street, Officer Hendry observed "a male black laying partially on the sidewalk and partially in the street, bleeding from the head. He appeared to be deceased." Officer Hendry stated that "[t]here was a crowd of more than a 100 people standing around . . . where the victim was lying." According to Officer Hendry, the paramedics arrived shortly after he did. He was then active in attempting to locate witnesses in the crowd. Officer William Kirby testified that numerous photographs were taken of the crime scene and evidence was collected. Officer Kirby stated that the crime scene and surrounding area was thoroughly searched for shell casings, projectile holes, bullet strikes, and other evidence indicating that weapons had been fired. According to Officer Kirby, no ballistic evidence or identifiable fingerprints were recovered from the crime scene. Doctor Thomas Deering testified that the victim, Chief, died from a single gunshot wound to the base of his neck.

Detective Mike Roland testified that he was assigned to investigate the murder of Chief. Detective Roland stated that on April 8, 2003, he received a call from the defendant. The defendant told him that he wanted to meet because "he didn't do what everybody is saying he did." Detective Roland explained that the defendant met with him the next day. Prior to the interview, Detective Roland advised the defendant of his *Miranda* rights, and the defendant signed a waiver of rights form. Detective Roland stated that the entire interview with the defendant was videotaped. The videotape was then played before the jury and admitted as an exhibit in the case.

According to the taped interview, the defendant first described the argument with Daniels and Chief over repairs made to Daniels' vehicle on Wednesday. The defendant stated that Chief "swung" at him, but he ducked and left the area. The defendant also stated that on Thursday morning, he saw these guys drive by as he was "fixin on this car on N. 3rd. . . . They kept on riding by, talking about "we gonna get you, nigga, and we gonna do this, and we gonna do that." The defendant further stated that he was putting brakes on a friend's car about 5:30 p.m. or 6:00 p.m. on Thursday, then left the projects.

When questioned by Detective Roland about his involvement in the shooting, the defendant initially denied it. However, when pressed, the defendant admitted to the offense. The following is a portion of the interview:

Roland: Okay, let's stop there. I want you to understand something before we go any further. I didn't call you and ask you to come down here because I wanted to know whether or not you shot Chief. I know you shot Chief. . . .

Defendant: Sir, I'm telling you the truth.

Roland: Don't. I don't even want to go there, because . . . from day one, we knew what happened. We knew you shot him. . . .

Defendant: Yes sir.

    . . . .

Roland: I know you got some sense about you. You're street-smart, you been around for a while, you work hard for every cent you get. I understand that. So I don't think you're a thug. . . . What I think, is that night. Thursday night over there, that one of those three or four guys, either Chief, Drew was out there, . . . Chris, DB, any of those boys, they carry guns, they sell dope, I know. . . . What did they do to provoke you to have to defend yourself, is one that I'm looking at, is that how it happened?

Defendant: They ganged me, for one thing . . . .

Roland: Well, I know they did on Wednesday, but I want to know what happened Thursday night?

Defendant: Like I said . . . when he kept on riding by, they were pointing pistols out the car, but when it all went down, I wasn't down there, I didn't go down there to kill him. And I didn't kill him.

Roland: Are you telling me that you didn't shoot him?

Defendant: I'm telling you that!

Roland: Okay, I'm going to tell you right now what's going to happen, because you're giving me a cold blooded [answer].

Defendant: No Sir.

    . . . .

Roland: Telling me you didn't shoot him ain't gonna get you nowhere but in the state penitentiary. Now don't play us like this. We didn't come looking for you and treat you like a f***ing thug. . . . We didn't do you like that. . . . You come down here and talk to us like a grown man and tell us the truth, or we'll treat you like a thug. It don't matter to me, but I want to give you that opportunity. Now, tell me why you shot him. Don't tell me you didn't because I know better. How many people was standing out? Man, there was a hundred people up and down that street. We're not stupid. Now tell me why you shot him, and let's work from there. Okay?

Defendant: (inaudible) They pulled a pistol out on me.

Roland: Which one exactly pulled a pistol?

-4-

Defendant: Chief

    . . . .

Defendant: Drew, something like that, it was a young dude. Him and Chief was standing right there by the dumpster together.

Roland: And what happened?

Defendant: When they pulled the pistol out,

Roland: (Interrupt) Both of them pulled a pistol out?

Defendant: Both of them did.

Roland: Drew pulled one too?

Defendant: And Drew . . . When he pulled the pistol out, I guess I just shot him, man.

Roland: Now that makes a lot more sense than what you said before, okay? So both Drew and Chief pulled a pistol?

Defendant: mmm hmm

Roland: And then you pulled your pistol, got a shot off, and headed out. Now did you know whether or not you hit anybody?

Defendant: No I don't.

Roland: Just one shot?

Defendant: Just one shot. I don't know if I hit anybody. I was just trying to scare them away to get them away from me.

    . . . .

Roland: What did Drew do?

Defendant: He shot. He tried to shoot me going up the sidewalk. . . .

Roland: There is something else we have got to know now. The pistol you had, what kind of pistol was it? . . . Revolver or automatic?

Defendant: It was a revolver.

. . . .

The defendant testified that Daniels approached him and asked him to install a radiator in his vehicle. After the radiator was installed, the defendant pointed out a problem with the engine. In response, Daniels blamed the defendant for the problem and asked for his money back. The defendant stated that at this time, he was being threatened by Chief, who was talking about jumping him. According to the defendant, Daniels, Booker, and Chief began riding by the defendant as he was working on a car. As they rode by, they told him that they were going to get him for messing up Daniels' car.

The defendant denied shooting Chief, the victim. The defendant asserted that prior to the shooting, about 5:45 p.m., he was inspecting the brakes on a Ford Bronco located on Joseph Avenue with his partner, Ricky Moss. After looking at the brakes and giving the customer an estimated cost of repair, the defendant and Moss began walking back towards Lischey Street. After stopping at a convenience store, they started up Grace Street and heard police sirens. At some point, the defendant and Moss split up and the defendant continued to walk back to Lischey Street. As the defendant continued towards Lischey Street, he encountered Booker and noticed that Booker had a pistol in his hand. According to the defendant, Booker asked him what he saw and then threatened to kill him and his family. As the defendant recounted, he had witnessed Booker and Chief arguing about money and drugs on February 29th.

The defendant testified that he confessed to Detective Roland because he and his loved-ones were threatened. However, he stated that he talked to "Detective Roland the day before, I talked to him." The defendant claimed that Detective Roland made him feel like "he didn't want to hear what [he] had to say no way." The defendant claimed that the self-defense theory was Detective Roland's idea. On cross-examination, the defendant acknowledged that he might have said "I'm going to get you," but asserted that the statement was general in nature and not made to anyone in particular. The defendant asserted that he felt threatened, but did not explain who threatened him or why he did not go to the police with the threat. The defendant also asserted that he talked with Detective Roland about fifteen minutes prior to the taped interview. The defendant stated that the first answer he gave was that he was not at the crime scene, but he later told Detective Roland that he fired in self-defense "to protect [his] people, [his] family."

Ricky Moss testified that on April 3, 2003, he was with the defendant on Joseph Avenue until 6:00 p.m. As he and the defendant were walking back, he observed police cars going to the "projects." Moss stated that the police cars were moving fast with sirens on. Moss testified that he was with the defendant at the time the homicide happened because it took "a pretty good while to walk from Joseph back to the projects." On cross-examination, Moss admitted that he could not say for certain what date he was with the defendant, but insisted that it was around the time the shooting happened. Moss also admitted that he had been friends with the defendant for years. Moss could not explain why after seeing that the defendant was involved in a shooting from the news, he did not

tell the police or the District Attorney's office that the defendant was with him. Moss admitted that, in January of 2005, he told the defendant not to worry because he would vouch for the defendant's whereabouts. Also, when asked by the prosecutor if he parted with the defendant at 5:30 p.m., Moss answered affirmatively.

Based upon the evidence presented, the jury found the defendant guilty of second degree murder. The trial court sentenced the defendant to twenty years as a violent offender.

## II. Analysis

On appeal, the defendant argues that the evidence was insufficient to support his conviction of second degree murder. Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Evans, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. Carruthers, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this Court. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. Id.

After considering the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found the defendant guilty of second degree murder. To sustain the defendant's conviction for second degree murder, the State was required to prove that the defendant knowingly killed the victim. Tenn. Code Ann. § 39-13-210(a)(1). At trial, the evidence established that the defendant, Daniels and Chief got into an argument over repairs made to Daniels' vehicle. The argument escalated into a brief scuffle, whereupon the defendant left the area after being punched. Subsequently, the defendant was heard saying, he "was going to get Chief." Thereafter, the defendant was observed shooting Chief and walking away. A few days later, the defendant met with Detective Roland and admitted that he shot Chief with a revolver. This evidence clearly supports all the necessary elements for the defendant's second degree murder conviction. Accordingly, this issue is without merit.

## III. Conclusion

-7-

Based upon careful review of the record, we affirm the judgment of the trial court.

_____

J.C. McLIN, JUDGE